# EXHIBIT A

1

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE
                        - - -

3    WEBXCHANGE, INC.,            :  CIVIL ACTION

4                 Plaintiff,      :

5          vs.                    :

6    ALLSTATE CORPORATION et      :

7    al.,                         :

8                 Defendants.     :  NO. 10-624 (SLR)
                                  :
9    WEBXCHANGE, INC.,            :  CIVIL ACTION

10                Plaintiff,      :

11         vs.                    :

12   DELL, INC.,                  :

13                Defendant       :  NO. 08-132 (SLR)
                                  :
14   WEBXCHANGE, INC.,            :  CIVIL ACTION

15                Plaintiff       :

16         vs.                    :

17   FEDEX CORP., et al.,         :
                                  :
18                Defendants      :  NO. 08-133 (SLR)

19                                    - - -

20
                              Wilmington, Delaware
21                            Tuesday, November 9, 2010
                              2:35 o'clock, p.m.
22
                                    - - -
23
     BEFORE:   HONORABLE SUE L. ROBINSON, U.S.D.C.J.
24
                                    - - -
25
                                   Valerie J. Gunning
                                   Official Court Reporter

1     APPEARANCES:

2
                 MORRIS, NICHOLS, ARSHT & TUNNELL
3                BY:  JULIA HEANEY, ESQ.

4
                          -and-
5

6                KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP
                 BY:  LAWRENCE GOODWIN, ESQ. and
7                     CHARLOTTE PONTILLO, ESQ
                      (New York, New York)
8

9                     Counsel for Plaintiff
                      WebXchange, Inc.
10

11
                 POTTER, ANDERSON & CORROON
12               BY:  DAVID E. MOORE, ESQ.

13
                          -and-
14

15               VINSON & ELKINS
                 BY:  CONSTANCE S. HUTTNER, ESQ.
16                    (New York, New York)

17
                          -and-
18

19               VINSON & ELKINS
                 BY:  EFREN GARCIA, ESQ.
20                    (Austin, Texas)

21
                          -and-
22

23

24

25

3

```
 1    APPEARANCES (Continued):

 2

 3              WINSTON & STRAWN
              BY:  KIMBALL ANDERSON, ESQ.
 4

 5
                   Counsel for Defendant
 6                 Dell, Inc.

 7

 8
              RICHARDS, LAYTON & FINGER
 9            BY:  LAURA HATCHER, ESQ.

10
                        -and-
11

12            FINNEGAN LLP
              BY:  JEFFREY A. BERKOWITZ, ESQ.
13                 (Reston, Virginia)

14
                        -and-
15

16            FINNEGAN LLP
              BY:  JOHN S. SIEMAN, ESQ.
17                 (Washington, D.C.)

18
                   Counsel for Defendant
19                 Fed-Ex

20                      -  -  -

21

22

23

24

25
```

4

1                    P R O C E E D I N G S

2

3               (Proceedings commenced in the courtroom,

4       beginning at 2:35 p.m.)

5

6               THE COURT:  All right.  Good afternoon, counsel.

7               (Counsel respond, "Good afternoon, your Honor.")

8               THE COURT:  As you can tell, my courtroom is set

9       up for trial, not for discourses among the Court and

10      lawyers, but we'll do the best we can.

11              I believe the function of our meeting today is

12      to move the case forward in terms of any lingering discovery

13      disputes, et cetera.  So why don't we make our introductions

14      and then we'll ask plaintiff to share what concerns it has

15      and then go to defendant.

16              MS. HEANEY:  Good afternoon, your Honor.  Julie

17      Heaney of Morris Nichols for WebXchange, and Lawrence

18      Goodwin and Charlotte Pontillo of Kasowitz Benson are here.

19              THE COURT:  All right.  Nice to see you.

20              Mr. Moore?

21              MR. MOORE:  Good afternoon, your Honor.  David

22      Moore from Potter Anderson.

23              And with me today from Vinson & Elkins are

24      Connie Huttner and Efren Garcia, and also Kimball Anderson

25      from Winston & Strawn.

5

1          THE COURT:  Yes.  How are you?

2          MS. HATCHER:  Good afternoon, your Honor.  Laura

3    Hatcher from Layton & Finger on behalf of the Fed-Ex

4    defendants, and with me today I have Jeffrey Berkowitz and

5    John Sieman from Finnegan.

6          THE COURT:  All right.  Fine.  Thank you very

7    much.

8          All right.  Let's start with Mr. Goodwin.

9          MR. GOODWIN:  Thank you, your Honor.  May I use

10    the podium?

11          THE COURT:  Yes, you certainly may.

12          MR. GOODWIN:  I think one of the first things

13    that we can do and take care of fairly quickly is to

14    finalize the case schedule.  For the most part, the parties

15    have agreed to the schedule.

16          THE COURT:  All right.

17          ·  MR. GOODWIN:  I think as good a, I think to lead

18    us through this as any, is Mr. Moore's letter from this

19    morning, which sets out the schedule.

20          THE COURT:  All right.

21          MS. HUTTNER:  Does your Honor need a copy?

22          THE COURT:  I guess I do.  I don't have it.  I

23    can pull it up on the computer.

24          MS. HUTTNER:  May I hand it up?

25          THE COURT:  Sure.  Thank you very much.

1          MR. GOODWIN:  The first item that I think we

2     need to discuss is the one in the middle of the second page,

3     the deadline for plaintiff to limit the number of asserted

4     claims.  And we will agree to the proposal by the

5     defendants.

6          We agree to allow the defendants to reduce the

7     number of prior art references to the date of their

8     choosing, which I believe is in July, and in return, we have

9     until May 16, 2011 to reduce the number of claims that we

10    will be asserting.

11         I believe the claims that, the number of claims

12    that we're asserting right now, the number 26.  We have

13    three patents-in-suit.  We don't think that that is a

14    terribly unwieldy number for three patents, but we would be

15    willing to reduce the number of claims down to about five

16    per patent, for a total of 15 claims.

17         We've not discussed any particular number of

18    prior art references that the plaintiffs have -- that the

19    defendants have agreed to reduce on their part.  However, I

20    think in order for this to have any meaning, the undertaking

21    that they will reduce the number of prior art references has

22    to be backed up with some kind of number, and perhaps we can

23    discuss that now, or perhaps we can agree with the

24    defendants offline, your Honor.

25         THE COURT:  All right.  We'll wait and see

1    what they have to say about that.  I know we are planning

2    to issue yet some more guidelines on my website about

3    summary judgment, because we've had cases of late where

4    we've had literally thousands of pages to review for summary

5    judgment and we just cannot do that anymore.  That fits in

6    with your thinking that if a defendant submits a summary

7    judgment motion on invalidity and obviousness with

8    combinations of a multitude of prior art references, with

9    only the slightest nod to what they mean, and instead refers

10   to thousands of pages of appendices, it just isn't

11   meaningful anymore to us.

12               And so whether it's by number or whether it's by

13   page limit, you will have some reduction.

14               MR. GOODWIN:  Thank you, your Honor.

15               The next item is the Rule 26(e)

16   supplementations.  And the close of fact discovery is set

17   for -- what is the close of fact discovery?

18               THE COURT:  I think May 16.

19               MR. GOODWIN:  May 16.  Thank you.

20               The defendants have requested supplementation a

21   few weeks before that.  We don't have any problem with that,

22   but we want to make it clear that both parties still have a

23   continuing obligation to supplement their responses so that

24   even after April 18th, if new facts are learned that require

25   supplementation, we just want to make it very clear that

1    it's our position that the parties need to supplement again,

2    if necessary.

3            THE COURT:  I have included that in my form, but

4    I've always wondered whether it really serves any purpose

5    since there is a continuing obligation regardless of whether

6    there's a date certain.

7            So if you all agree that there's a continuing

8    obligation and a date certain really does not serve any

9    purpose, I'm happy for you to leave it out, and I'm thinking

10    about taking it out of my form scheduling order as well.

11            MR. GOODWIN:  Okay.  The next item that

12    indicated a difference between the parties was near the

13    bottom of page 3, the exchange of trial fact witness lists.

14    We'll go ahead and agree with defendants that November 1,

15    2011, is okay.

16            THE COURT:  All right.  Is that consistent with

17    what happens in my cases, normally?

18            MR. GOODWIN:  You know, your Honor, I believe it

19    is.

20            THE COURT:  All right.  Well, if it is --

21            MR. BERKOWITZ:  Yes.

22            THE COURT:  All right.  Good.

23            MR. GOODWIN:  And I think that's it in terms of

24    the schedule.

25            THE COURT:  All right.  Let's hear from counsel

1    for defendant before we move on, counsel for defendants, to

2    see if there are any issues that we need to address in that

3    regard before we move on to the discovery issues.

4           Anything?

5           MS. HUTTNER:  Your Honor, we have no issue with

6    what Mr. Goodwin has said, and we are satisfied that he has

7    come around a little in our way.

8           I think the only issue we see is in reduction of

9    number to 15 claims as opposed to the eight to ten that we

10   had suggested.  We think it's going to be very difficult for

11   a jury to understand and to try 15 claims, particularly

12   because these claims are fairly obtuse.  These are pretty

13   esoteric claims to begin with and the differences between

14   them are, you know, subtle, to say the least.

15          THE COURT:  Well, it seems to me that I suspect

16   you're not going to have 15 claims to try.  I will probably

17   have 15 claims to deal with on summary judgment.  So I would

18   not argue too much more about it at the moment.

19          MS. HUTTNER:  Very well, your Honor.

20          As to the number of references, what we had

21   suggested in our submission to your Honor is that when we

22   submit our expert reports, our intention is to reduce the

23   number to a number that really is triable to a jury.  We

24   don't intend to come in with any great number of claims

25   either at trial or on a summary judgment motion, and we

1    understand your Honor's point.  So I don't think going

2    forward on this will be an issue.  If it is, I think we can

3    probably work it out with Mr. Goodwin.

4            THE COURT:  All right.  It seems to me that we

5    are all more or less on the same page with respect to that.

6    It could be that we start out at the summary judgment stage

7    with more prior art references and more claims than will be

8    possible to present to a jury, but at this point, I think

9    you've made good-faith efforts to reduce what I have to deal

10   with on summary judgment anyway.

11           MR. BERKOWITZ:  All right.  That's it.

12           THE COURT:  All right.  Good.  I will allow you

13   to put this into a form that I can sign off on and --

14           MR. BERKOWITZ:  Your Honor --

15           MS. HUTTNER:  There was one other point.  We

16   just wanted to make sure in terms of the schedule, and we're

17   going to discuss bifurcation in a moment, but one point I

18   just want to make the Court, make sure the Court is focused

19   on.  We have two separate cases that have been consolidated

20   for discovery only.

21           THE COURT:  Right.

22           MS. HUTTNER:  And both defendants are wanting to

23   have a separate trial.

24           THE COURT:  All right.

25           MS. HUTTNER:  Because the two systems that

1    are accused are not similar.  The order has one date

2    for final pretrial and one date for trial, and I don't

3    know whether that was intentional or whether we need to

4    set different dates.  But I just wanted to flag that for

5    your Honor.

6              THE COURT:  I don't think we need to set

7    separate dates.  It seems to me -- well, I guess my feeling

8    was that there was enough overlap that it wouldn't be -- I

9    mean, if you are going to be on the same summary judgment

10   schedule and we're going to be overlapping in oral argument

11   because there are claims and constructions that are in

12   common, it does not strike me that it is inappropriate for

13   us to have pretrial conferences that follow one another at

14   the same time, and that our trial schedule we can work out

15   at the pretrial conference, to see whose case requires more

16   time and how everyone's scheduling is in terms of their

17   expert witnesses.

18             So that was a long answer to say, I anticipated

19   that the pretrial conferences would, if not be held at the

20   same time, one following the other, because I suspect you'll

21   have many issues in common, and that at that point, we can

22   work out the trial schedule.

23             MS. HUTTNER:  Fair enough, your Honor.

24             MR. BERKOWITZ:  Thank you.

25             THE COURT:  All right.  Now, bifurcation.  I

1   have found that my new, relatively new bifurcation, is

2   working well for me, and given my history with the stent

3   cases, which actually settled for $1.7 billion without the

4   need for a trial, that it probably works out for the clients

5   as well.

6           So unless this is an extraordinary case, I will

7   follow my standard practice of bifurcation, although for

8   purposes of the record, Mr. Goodwin, if you'd like to

9   preserve something, you certainly may.

10          MR. GOODWIN:  Well, your Honor, it would be our

11  preference not to bifurcate, but we understand the Court's

12  position.

13          THE COURT:  All right.

14          MR. GOODWIN:  So that's all I have.

15          THE COURT:  All right.

16          MS. HUTTNER:  Your Honor, may I just ask for a

17  clarification?

18          THE COURT:  Yes.

19          MS. HUTTNER:  The bifurcation order is with

20  respect to both discovery and trial or limited to trial?

21          THE COURT:  My standard order should say that it

22  is with respect to discovery as well, except the fact that

23  the magistrate judge will require some limited exchange of

24  damages documents to help settlement.  So there will be some

25  limited exchange for purposes of furthering ADR.

1          MS. HUTTNER:  Okay.  And, your Honor, apropos

2     ADR, I just wanted to make you aware, and you may be aware,

3     but we had an ADR before Judge Stark prior to the case being

4     transferred to your Honor.

5          THE COURT:  Right.

6          MS. HUTTNER:  So I mean we're not objecting

7     necessarily to Judge Thynge, but I wanted to make you aware

8     of that.

9          THE COURT:  Right.  And I thought that the cases

10    that were going to stay with Judge Stark for ADR, I issued

11    an order, and otherwise, they would go to Judge Thynge.

12         Did I not do that in this case?

13         MS. HUTTNER:  You did.  We had already had

14    an ADR with Judge Stark before the case was transferred to

15    you.

16         THE COURT:  Right.  But as I said, I thought

17    that I should have made some specific remark on the record,

18    because the fact that you've had one ADR and it did not

19    work does not mean that our magistrate judges don't follow

20    up.

21         So did I not say anything about ADR in this

22    case?

23         MS. HUTTNER:  Not that I can recall, your Honor.

24    I apologize if you didn't.

25         THE COURT:  All right.

1    MS. HEANEY:  I believe you referred us to

2    Magistrate Judge Thynge.

3        THE COURT:  Well, for whatever reason, that was

4    a decision that was reached with discussion between me and

5    Judge Thynge and Judge Stark.  So if I did something, it was

6    with some consideration.

7        MS. HUTTNER:  That's fine.

8        THE COURT:  All right.  I have to say, it's

9    water over the bridge, or water over the damn, whatever, and

10    I don't have a specific recollection.

11        All right.  The one other issue here is the

12    additional time, the difference between personal time and

13    30(b)(6) time.  And it strikes me that generally, there is a

14    difference between the two.  But are you all still fighting

15    over it?

16        MR. GOODWIN:  May I, your Honor?

17        THE COURT:  Yes, you may, Mr. Goodwin.

18        MR. GOODWIN:  Thank you.

19        First, a little background.  The defendants have

20    already deposed the owner of WebXchange and the inventor for

21    14 hours now over a period of four days.  She's 63 years

22    old.  She has diabetes.  She has a thyroid condition.  She

23    has other medical issues.

24        These depositions have been extremely grueling

25    for her.  They've not been an easy thing to do.  And the

1    defendants want another 18 hours with her, your Honor.  We

2    think that that is an outrageous request.  We think that the

3    amount of time that has been wasted during the first 14

4    hours is truly remarkable.

5            If your Honor will permit me, I would like to

6    give the Court some flavor for the kinds of questions that

7    have been asked during the first 14 hours.

8            "Question:  In fact, though, you don't

9    personally own your house; isn't that correct?"

10           That went on for three pages of transcript.

11           "Question:  Who are you married to?

12           "Question:  Does he have another name?  Can you

13   tell me anything else about him?  Do you live with him?"

14           That went on for four pages.

15           "Question:  What are your parents' names?  Are

16   your parents alive?  Do they have siblings?  How many?  Can

17   you tell me their names?  Where do your brothers and sisters

18   live?  What are their addresses?  How old are your brother

19   and sister?"

20           That was six pages.

21           "Question:  You got divorced from your first

22   husband; correct?

23           "Question:  You fled to Canada because you were

24   concerned that he would come back; is that correct?

25           "Question:  When did you marry Mr. Diaz?

1          "Question:  Did you meet him at Rice University?

2     Was he also a graduate student there?  What field was he in?

3     How long were you married to him?  Did you live with him

4     during the entire period?  Do you have any children?  Are

5     you still in touch with Mr. Diaz?"

6               Another five pages.  And, your Honor, I could go

7     on.

8               THE COURT:  Actually, I'd like a copy of that.

9     I teach a class in pretrial advocacy, and having examples of

10    good or bad depositions is always interesting to me.

11              All right.  So did anyone keep track of the

12    personal questions like that versus the 30(b)(6) kind of

13    questions?

14              MR. GOODWIN:  We did, your Honor.  And some more

15    in the way of background, Dr. Arunachalam is not only the

16    president of the company, she's the inventor, so she speaks

17    for the corporation right off the bat.  There's no question

18    about that.

19              Among the 30(b)(6) topics were things about the

20    invention, the business, things that you would naturally

21    assume that Dr. Arunachalam would address in her corporate

22    capacity as well as personal.

23              But we went through the transcript and compared

24    her testimony and the questions with the 30(b)(6) topics and

25    we sent a letter specifically pointing out those areas of

1    30(b)(6) testimony that she has already covered.  We

2    requested that the defendants inform us as to what hasn't

3    been covered in the way of 30(b)(6) testimony.  We've not

4    heard back from them.

5         We believe that all the 30(b)(6) testimony,

6    virtually all of the 30(b)(6) testimony, has been covered.

7    And we would suggest that absent some kind of response from

8    the defendants, it would be inappropriate to schedule any

9    further deposition time with this witness, who, again, is,

10   it's fair to say that she's ill.

11        THE COURT:  All right.

12        MR. GOODWIN:  Thank you.

13        MS. HUTTNER:  Your Honor, I want to, just by way

14   of background, start with Judge Farnan's order in this case,

15   which had set 14 hours of personal deposition time for Dr.

16   Arunachalam with no limitation on 30(b)(6) testimony, and

17   also had allotted the defendants collectively 200-plus hours

18   of deposition time, of which I think we've used maybe 20, at

19   most.

20        There was certainly no suggestion during Dr.

21   Arunachalam's deposition that she was in any way feeble or

22   unwell, and, indeed, I asked her whether she had any health

23   issues that would preclude her from testifying or making it

24   difficult, and she testified that she did not.

25        The excerpts that Mr. Goodwin read you were from

1   her personal deposition, and I will address in a minute why

2   those questions were asked and why we believe that those

3   questions, as well as many others that go directly to

4   statements we believe false statements made on her various

5   resumes and business plans that were provided to potential

6   licensees and others were necessary to ask.

7          But let me start with the 30(b)(6) issue,

8   because I do think that's a separate and distinct issue and

9   that your Honor's statement at the beginning of this line of

10  discussion was accurate.

11         The sequence here I think is important.  Her

12  initial day of personal deposition was, I believe, in

13  October of 2008.  We did not serve any 30(b)(6) notices

14  until over a year after that, so at the time of her first

15  deposition, there were no 30(b)(6) topics, and there

16  certainly was no suggestion or indication from the

17  plaintiffs or anyone that she was testifying with respect to

18  potential 30(b)(6) issues.

19         We did not serve those notices until over a year

20  later, I believe in February of 2010, I think.  And then the

21  second day of her deposition was in August of 2010.  It was

22  not until a week before the resumed -- we had, I think,

23  eight-and-a-half hours left of the personal deposition time

24  at that point.  A week before that resume date that we

25  received a letter from the plaintiffs for the first time,

1    indicating that she would be testifying with respect to, I

2    think they designated 15 or 16 of the 30(b)(6) topics out of

3    maybe 26 that we had identified.

4          We wrote them immediately, saying that we did

5    not agree to take her deposition on 30(b)(6) topics in

6    combination with her personal deposition, that we did not

7    believe -- while we would make every effort to cover what

8    ground we could, that we did not believe it would be

9    possible given the amount of material and the number of

10   topics that were -- that this witness is really the only

11   witness to testify about.

12         They refused to grant any additional time with

13   her.  We had offered to compromise on, and, indeed, we did

14   compromise on the amount of time we asked for.  And the only

15   offer that we got from them, which was withdrawn, was an

16   additional four hours of her time.

17         They have not gone back and designated any of

18   her testimony from either the first or second day of her

19   deposition as 30(b)(6) testimony on behalf of the company.

20   They did identify in correspondence coming out of the meet

21   and confer leading up to today certain pages, which they

22   contend include questions that would fall under one or more

23   of the topics, and I'm sure that they do.

24         That collective page numbers, if you add up

25   everything they've identified, is about 30 percent of the

1    total transcript of her personal deposition.

2          The bulk of her personal deposition was about

3    issues that are personal to Dr. Arunachalam.  Namely, her

4    financial history, her many statements on business plans and

5    resumes, which we believe are false, including statements

6    about her educational background in India, statements about

7    her alleged accomplishments, statements about her job

8    history and her status as a network pioneer or network

9    Internet pioneer, which she has touted to prospective

10   licensees and purchasers of her patents.

11         These issues, particularly those issues relating

12   to the financial condition of WebXchange -- and just by way

13   of an aside, your Honor, there was a lot of intermingling of

14   her personal funds with the company's money, as it appears

15   in the deposition transcript.  There is case law directly on

16   point indicating that that is germane to the hypothetical

17   negotiation.

18         In addition, statements that she made, false

19   statements that she made --

20         THE COURT:  We're not doing damages, so I'm not

21   sure how important that is.

22         MS. HUTTNER:  At this point, your Honor, we're

23   not, but at the time of the deposition, damages had not been

24   bifurcated, and so that was why we were asking those

25   questions.

1        In addition, the statements that go to what we

2    believe are lies, many lies, are what Dr. Arunachalam

3    testified on the record, she described it as marketing

4    puffery, was her testimony.

5        In many instances, on her resume and on her

6    business plans that were widely distributed to prospective

7    licensees and prospective buyers of her patents, she made

8    statements which are clearly, and which she admitted, are

9    clearly false that we think go directly to her credibility.

10   And we expect that she will be a witness for them at trial,

11   perhaps the only witness that is not an expert witness for

12   them at trial.

13       THE COURT:  And so how many hours of deposition

14   have you taken?  And do defendants contend that all of those

15   hours were personal deposition time?

16       MS. HUTTNER:  We do contend that, your Honor.

17   We took 14 hours, which is what Judge Farnan allotted for

18   personal deposition time.  We contend that it was all

19   personal deposition time.  The first five hours were

20   conducted before the 30(b)(6) topics were even identified.

21       THE COURT:  But yet you still request an

22   additional half-day of personal deposition time?

23       MS. HUTTNER:  Because, your Honor -- again, I'm

24   more than happy to hand up examples or I can walk you

25   through.

1        But if you look at the transcript, I mean, some

2    of the reason why you took three or four pages, for example,

3    to get answers to what appear to be relatively

4    straightforward questions is because Dr. Arunachalam's

5    testimony was evasive on many points.  And we can provide

6    you with many examples of that from her transcript, where it

7    took five or six pages to get a yes-or-no answer to fairly

8    basic questions.

9        THE COURT:  And so are there literally topics

10    that you never got to address, or what is it?  I mean, it

11    isn't unusual for it to be difficult to extract the

12    information you want from someone in a deposition.

13        The question is, if you are given 14 hours and

14    you want more, why is it that you are asking for additional

15    time?

16        MS. HUTTNER:  Well, there are two issues.  One,

17    your Honor, the 14 hours of additional time that we're

18    asking for is with respect to the 30(b)(6) topics.

19        THE COURT:  I'm not talking about that.

20        MS. HUTTNER:  As to the personal deposition, we

21    think there are some additional matters that are more

22    properly addressed as part of her personal deposition that

23    we could clear up in half a day.

24        If you ask me which is the more important point,

25    clearly, the 30(b)(6) depositions are really what is most

1    critical here.  We feel that on the personal depositions,

2    that we did not have time to ask her some questions

3    regarding issues that they may contend are not covered by

4    the 30(b)(6) topics because of what we believe was evasive

5    testimony beyond the norm on her part.  And so that is the

6    reason for asking for four additional hours of personal

7    time.

8            THE COURT:  And you believe two full days,

9    further days of deposition on your 30(b)(6) topics are

10   necessary because?

11           MS. HUTTNER:  Because, your Honor, there are --

12   there are a couple things you should know.  There are three

13   pending re-examinations.  The three patents-in-suit, three

14   re-examinations.

15           THE COURT:  Everything is being re-examined.

16           MS. HUTTNER:  Right.  So there's a voluminous

17   record in those examinations which incorporates, for

18   example, many of her business plans where she has contended

19   that her business plans were a part of her reduction to

20   practice, and so there are, I think, 26 different versions

21   or so of her business plans.  I mean, there's a very

22   extensive, you know, factual record that is a

23   document-by-document thing, because there are changes

24   between each version of these business plans.

25           There are affidavits that are submitted in the

1   PTO which need to be gone through, which in some instances

2   seem to contradict representations that she made to the

3   Court in response to motions that have been filed, for

4   example, in this case.

5          So there are a lot of documents that, even

6   leaving aside damages, which is now off the table, that go

7   to the issue of conception, that go to the issue of

8   reduction to practice, that go to really some core issues

9   here with regard to the validity of the patents, you know,

10  that we think we're entitled to inquire into, as she's the

11  only person to answer the questions.  I mean, they obviously

12  could have prepared someone else, but they designated her on

13  all these topics.  And so that is why she is in the position

14  that they're complaining where she is having to testify

15  here, because they chose to designate her on all these

16  topics.

17          They do have a couple of other employees or

18  former employees that they've designated, or they've

19  said they're going to designate on some other topics, but

20  Dr. Arunachalam is who they picked for the bulk of the

21  30(b)(6) topics on technical issues.

22          THE COURT:  All right.  Thank you.

23          Mr. Goodwin?

24          MR. GOODWIN:  May I?

25          Just a couple of points.  Dr. Arunachalam did

1   testify about her illnesses at her deposition.  We

2   specifically said in correspondence back in 2008, before the

3   very first deposition, that she would be testifying both as

4   a 30(b)(6) witness and in her personal capacity.  It only

5   stands to reason, your Honor, she is the principal at the

6   company.  And, true, that was before the 30(b)(6) notice.

7   However, the notion that we never informed the defendants of

8   her 30(b)(6) status until one or two weeks before the

9   deposition I think is certainly not true.

10          One of the things that I would like to present

11   to your Honor, I have a copy, and this is our letter of

12   November 2nd to the defendants, where we specifically

13   designated those portions of the deposition transcripts as

14   corresponding to specific 30(b)(6) topics, and I would be

15   happy to hand that up to you.

16          THE COURT:  Well, I don't know that it's

17   helpful.  I think the problem here is, if everyone came

18   into this with, I think, the standard -- well, apparently,

19   Judge Farnan embraced what I generally do, which is that

20   parties always have twice as much time with an inventor

21   as they do with most any other witness.  And if this

22   individual is not only the inventor, but the president

23   of the company, and plaintiff has, in fact, designated her

24   to answer, then I don't believe that plaintiff can complain

25   about there being time in addition to the 14-hour inventor

1    deposition.   The question is whether this additional time is

2    appropriate or not.

3            And it strikes me that, number one, if this

4    witness has health problems, that there are ways to

5    structure the deposition so that it's not seven hours

6    straight.   I mean, there are ways to do this without having

7    an undue burden on the witness.   But I do believe that under

8    these unusual circumstances, that the defendants can have an

9    additional 14 hours.   And I don't care if you use four of

10   them for personal and the rest for 30(b)(6), but,

11   defendants, you have to indicate on the record whether this

12   is a personal, whether you're asking a block of questions

13   for personal or a block of questions for 30(b)(6), so that

14   the deponent understands the capacity in which she is

15   answering.

16           But I'm going to allow 14 more hours of

17   deposition under these unusual circumstances.   And I trust

18   the parties can structure this so as not to place any undue

19   burden on this deponent if she, in fact, has health issues.

20   All right.

21           Are there other issues besides those addressed

22   in Mr. Moore's letter?

23           MR. GOODWIN:   Yes, there are, your Honor.

24           THE COURT:   All right.

25           MR. GOODWIN:   An issue that we want to address

1   is the, it's a refusal of Fed-Ex to provide meaningful

2   discovery with regard to their so-called tracking system.

3         Let me begin by giving some background.  It's

4   fair to say in this case that Fed-Ex presents, or Fed-Ex has

5   fought us concerning discovery from the very beginning of

6   the case.  It has been like pulling teeth trying to get

7   discovery from them.  They have given us old code, code

8   that's not used, code with gaps.  Their production of code

9   in this case has come very late, and remarkably, Fed-Ex

10   refused outright any discovery with regard to their basic

11   infringing system, their shipping system.  They wouldn't

12   give us any discovery.

13         We made a motion to compel before Judge Farnan.

14   That motion was granted.  But the specific issue before the

15   Court today is our 30(b)(6) notice with regard to the Fed-Ex

16   tracking system.  This is the system that allows somebody to

17   sit down at a computer and click on a package number or a

18   tracking number and actually track its progress.  We noticed

19   that deposition, I believe it was in April of 2009.  We took

20   the deposition in November of 2009.

21         The night before the deposition, Fed-Ex produced

22   over a thousand additional pages of code.  They presented a

23   witness, a 30(b)(6) witness, who was completely unprepared,

24   could not answer basic fundamental questions about the code

25   that had been produced before, couldn't answer basic

1   fundamental questions about the code that was produced the

2   night before.  And I'm talking fundamental questions,

3   whether or not this code was actually used, things like

4   that.

5            It was a terrible performance, your Honor, the

6   worst I've seen in terms of 30(b)(6) witness preparation.

7   We tried to figure out the best way to proceed on this.  We

8   could have pounded on the table, gone to the Court, but what

9   we decided to do was to write down precisely what we were

10  looking for.

11           These systems are complicated, and we submitted

12  a deposition on written questions.  It was about 130, I

13  think about 130 written questions that were very focused,

14  and, if answered, would give us the discovery that we're

15  entitled to.

16           Fed-Ex has refused to answer the questions

17  unless we agreed to narrow the scope to be limited only to

18  the software that was produced the night before the

19  deposition.  That would be fine if we got answers on

20  everything else, but we didn't.

21           We need the discovery.  My understanding is that

22  if you are giving a deposition, you know, whether it's an

23  oral deposition or a deposition of written questions, the

24  questions have to be answered over objections unless and

25  until the deponent files a motion for a protective order.

1      That's what we feel is appropriate right now.

2  That's where we are.  And we think that -- well, first, we

3  would like answers to the deposition, the written

4  deposition, and if Fed-Ex is not willing to do that without

5  qualification, we believe that they should -- the proper way

6  to proceed is for them to file a motion for a protective

7  order.

8      THE COURT:  All right.  Let's take that issue.

9      MR. GOODWIN:  Thank you.

10     MR. BERKOWITZ:  May I, your Honor?

11     THE COURT:  Yes, you may.

12     MR. BERKOWITZ:  Your Honor, to say that Mr.

13  Goodwin's representations is an overstatement is beyond.  I

14  mean, essentially, Fed-Ex has never refused anything.  We

15  had a specific issue with regard to a different piece of

16  software.  They filed the motion to compel in front of Judge

17  Farnan.  The motion to compel was granted and we provided

18  the discovery.  Okay.  That's a non-issue.

19     With respect to the tracking, there was a

20  deposition, and we've agreed to more deposition time with

21  the witness.  In fact, during the deposition, I specifically

22  said to Mr. Goodwin, if you need more time with the witness,

23  he's available today and we'll make him available again at

24  another time, if you want.  So to say that we've entirely

25  refused, which I think is how he started out, is, frankly,

1   utterly ridiculous.

2           Mr. Goodwin's position is essentially based on

3   two positions here, I think; right?  He wants essentially

4   Fed-Ex to answer 132 additional interrogatories.  Okay?  I

5   have copies of them, if you'd like, but, frankly, they're,

6   you know, what's your name, but then they go into, word by

7   word or line by line of specific code.  Frankly, they're

8   difficult to understand for a novice.

9           In any event, we never refused to answer those

10  questions altogether.  We simply said that there are certain

11  questions that we're not going to provide a witness on.  And

12  we opened up a dialogue to discuss this.  Okay?

13          And that had been, I believe, in January of

14  2010.  Okay?  October of 2010, when the case was transferred

15  to your Honor, was the first time this issue was even raised

16  by Mr. Goodwin.  So this is something that has gone on for

17  awhile.

18          If you're interested, your Honor, I'm happy to

19  address Mr. Goodwin's position on the preparedness of the

20  witness.  The witness had been working in Fed-Ex tracking

21  for 15 years.  He wrote code.  He designed code.  He

22  testified that he spent as much as 60 hours preparing for

23  his deposition by reviewing code.

24          The bottom line is the witness was prepared.

25  In this particular case, there's a difference, right,

1    between the witness being prepared and the attorney not

2    liking the question that he's getting answers to, or rather

3    answers that he's getting to the questions that he has

4    posed.

5         The fact of the matter is that the witness knew

6    that code.  On the other hand, the analysis that was done by

7    plaintiffs was incomplete.

8         And I need to address one other thing, if you

9    don't mind, your Honor, and that is this software that was

10   produced the night before the deposition.

11        First of all, it wasn't the night before the

12   deposition, in any event.  It was produced, and that

13   particular software was produced later in the case for a

14   very good reason.  And that is, at the beginning of the

15   case, plaintiff said that this case was about processes on

16   the Internet that use a particular kind of technology.  They

17   called it Web Services or Soap XML Messages.  It's beyond

18   the scope of this particular discussion.

19        In any event, we produced the code from Fed-Ex's

20   systems that did this.  Now, as Mr. Goodwin said, Fed-Ex's

21   system is a pretty complex system.  One engineer from Fed-Ex

22   once told me that he believed there are as many as five

23   million pages on this website.  It's a very complex system,

24   I agree, and that was the reason why we specifically said to

25   plaintiff that we were producing this particular kind of

1    code.  Okay?  We produced that code.

2         A week before the deposition, we asked them if

3    they would be kind enough to provide us with screen shots of

4    anything that they're going to show the witness during the

5    deposition.  Now, I've been in depositions where attorneys

6    have tried to, you know, jiggle around showing the computer

7    monitor on the video screen so that they could possibly get

8    the witness as well as the video of a Web page, and that was

9    my reason for asking for the pages in advance.

10        They sent us the pages two days before.  We made

11   an investigation.  We found that there was additional code

12   behind those screens.

13        Now, the code behind those screens, Mr. Goodwin

14   may not understand it, but it actually does not use Web

15   services or Soap XML messages, the core issues in this case,

16   essentially.  In any event, the witness was prepared to

17   testify on that.  And from day one, we've said we understand

18   that we produced this late.  We understand that you're

19   upset.  So be it.  We'll give you more time with the

20   witness.

21        So I mean to us, it has been a non-issue.  It

22   has been a non-issue for a year while they've been quiet

23   about it.  But it is what it is, and they wanted to involve

24   the Court at this point on it.

25        THE COURT:  So it's not really a question of

1   being unsure what code is relevant?  I mean, this is source

2   code?

3               MR. BERKOWITZ:  Yes.  I'm sorry.

4               THE COURT:  And this is a fact witness?

5               MR. BERKOWITZ:  Correct.

6               THE COURT:  I mean, generally, there are fights

7   about only the most expert of the experts having access to

8   source code, and here we're fighting about a 30(b)(6)

9   witness on source code.  That's a new one.

10              MR. BERKOWITZ:  Well, we're not really fighting

11  about it from our standpoint because we gave them the

12  witness and we've said, you can have the witness again.

13              THE COURT:  Right.

14              MR. BERKOWITZ:  But what they want --

15              THE COURT:  You know what I meant.  We're having

16  this discussion about source code and a 30(b)(6) witness,

17  which I've never had before.  Maybe I've been out of this

18  discovery business too long, but after sitting through this,

19  it hasn't been long enough.  All right.

20              Let me talk to Mr. Goodwin, because I'm not

21  exactly sure what it is, Mr. Goodwin, that you are unclear

22  about, and why you believe written deposition questions

23  are a better way of going than having a person answer

24  them.

25              MR. GOODWIN:  Well, your Honor, the reason

1    is that the experience of the deposition with Mr. Neeley --

2          THE COURT:  And, first of all, I mean, I have

3    never had 30(b)(6) witnesses on source code.  That is

4    usually something that the experts review and determine.

5    So why are you even bothering with a 30(b)(6) witness as

6    opposed to an expert?

7          MR. GOODWIN:  Well, this is the foundation of

8    the facts that we need to gather and we're going to give

9    them to the expert.

10          THE COURT:  Well, that's fine, but I thought

11   source code was pretty self-explanatory.

12          MR. GOODWIN:  Oh, no, your Honor, please.  I

13   need to disabuse the Court of that notion.  These are wildly

14   complicated --

15          THE COURT:  Well, what I meant to say is, an

16   expert is usually the one asking the questions of the folks

17   while they're reviewing the source code.  I thought it had

18   been my understanding that they are the ones asking the

19   questions, not attorneys.  And if, in fact, it's as complex

20   as you say it is, and if, in fact, the deposition didn't go

21   forward as well as it might because it is so complex, I'm

22   just saying, why is this fact discovery and not expert

23   discovery, fodder for expert discovery?

24          MR. GOODWIN:  We're not asking for any opinions,

25   your Honor.  All we want to do is find out how the systems

1    work.  It's that simple.

2              THE COURT:  Well, all right.  All right.  So

3    you're saying that this deponent wasn't satisfactorily

4    prepared and you were, and so now we've got 130-some written

5    deposition questions that are essentially interrogatories,

6    far beyond the 25 or 50, or whatever that you want defendant

7    to answer?

8              MR. GOODWIN:  Well, your Honor, I would be more

9    than happy to pass up or actually read passages from the

10   transcript to show that the witness was thoroughly

11   unprepared.

12             THE COURT:  Well, I surely don't want you to

13   read passages.

14             MR. GOODWIN:  All right.

15             THE COURT:  But it strikes me for me to make a

16   decision this, I would have to review the deposition.

17             MR. GOODWIN:  I would be happy to submit that to

18   your Honor.

19             THE COURT:  All right.

20             MR. GOODWIN:  Your Honor --

21             THE COURT:  And, actually, you know, I'm not

22   sure that I could tell who is in the right and who is in the

23   wrong here, and this might be a situation where I need to

24   refer this to a special master because, quite frankly, I

25   don't have the time or the inclination to decide whether you

1    simply didn't understand it or whether the witness wasn't

2    prepared.  I don't know that I could make that

3    determination.

4         And I think the only issue is whether -- if the

5    only issue is whether it's more appropriate to go back to

6    written questions than it is to redepose this person, that

7    really is the only issue, is it not?

8         MR. GOODWIN:  Well, we thought the written

9    questions would be the best way to proceed because, again,

10   from the nature of the deposition that we took, it was

11   abundantly clear that Mr. Neeley, the deponent, could not

12   piece this together on his own as he sat there.  By

13   submitting the deposition of written questions, this would

14   allow them to know ahead of time what the questions are and

15   to provide answers after thinking about them over

16   objections, if they'd like.

17        But to us, it was a very, very straightforward

18   way, or the most straightforward way to get a basic

19   understanding of how the systems work.  And we're not trying

20   to -- we're trying to do this -- what we're trying to do is

21   to solve the problem.  The problem was understanding a

22   complicated system that the witness could not explain to us.

23   And --

24        THE COURT:  And, once again, during fact

25   discovery and not through expert discovery?

1        MR. GOODWIN:  Absolutely, your Honor.  We got

2   exactly the same discovery from Dell without arguments,

3   without fights.  We had depositions concerning two of their

4   systems.  We got the testimony.  It was very

5   straightforward.  Based on that testimony, our experts are

6   going to be able to opine as they need to.  But we can --

7   well --.

8        THE COURT:  Well, I surely hope your experts

9   aren't going to rely on fact depositions to opine as opposed

10  to look at the source code themselves.  But I guess that's

11  your business, not mine.

12       Well, all right.  I will take a look at the

13  deposition.

14       MR. GOODWIN:  Thank you.

15       THE COURT:  What else is there?

16       MR. BERKOWITZ:  Your Honor, there are one or two

17  additional items, if I may.

18       One is drafts of expert reports.

19       THE COURT:  I never allow.

20       MR. BERKOWITZ:  So they're not discoverable?

21       THE COURT:  No.

22       MR. BERKOWITZ:  Okay.  And I think prior to your

23  Honor coming in, we may have reached some agreement on

24  something, but just to be clear, there are certain documents

25  that are with Dr. Arunachalam's accountant that we had

1    subpoenaed, and the subpoena -- the accountant rightfully

2    came back and said you need to have permission.  We've asked

3    for permission and we have not gotten that.

4              Again, this goes to some of the financial

5    interest, but perhaps we can put that for another day

6    because of the damages as being put off.

7              And I think that's it.  Thank you, your Honor.

8              THE COURT:  Mr. Goodwin?

9              MR. GOODWIN:  I think the only pending issue

10   that Mr. Berkowitz addressed were the accounting records,

11   and we believe that that is probably premature given the

12   Court's bifurcation.

13             THE COURT:  All right.  Unless a Magistrate

14   Judge requires some of that information for purposes of

15   exploring settlement, although it does not strike me that

16   you're down approaching that point in time, you're right.

17             MR. GOODWIN:  Thank you.

18             THE COURT:  All right.  I would like that

19   deposition -- well, as soon as you get it to me, the sooner

20   I can turn it around.

21             MR. GOODWIN:  We appreciate it, your Honor.

22   Thank you.

23             THE COURT:  All right.  And if I have any

24   questions, I will get you on a telephone conference in terms

25   of a resolution to that issue.

1            All right.  So you're going to get me the

2     deposition.  You're going to get me the pretrial scheduling

3     order.  And I think that's all; right?

4            MR. GOODWIN:  I think your Honor also asked for

5     portions of Dr. Arunachalam's deposition transcript.

6            THE COURT:  I'm not sure I need that under the

7     circumstances given that it was taken before I was the

8     Judge.

9            MR. GOODWIN:  Okay.

10            THE COURT:  All right, counsel.  Thank you very

11     much are for your time.

12            (Counsel respond, "Thank you, your Honor.")

13            (Court recessed at 3:26 p.m.)

14                        --  --  --

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

# FINNEGAN

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
WWW.FINNEGAN.COM

November 12, 2009

Charlotte Pontillo, Esq.                                    **Via Electronic Mail**
Kasowitz, Benson, Torres & Friedman, LLP         **Confirmation via U.S. Mail**
1633 Broadway
New York, New York 10019

Re:   *WebXchange, Inc. v. FedEx Corp. et al., CA No. 08-133-JJF*

Dear Charlotte:

We write in response to your letter of yesterday regarding FedEx's supplemental production of source code related to FedEx tracking systems.

On November 10, 2009, two days before the tracking deposition, WebXchange identified for the first time "four screen captures of FedEx web pages" that WebXchange stated it may use during the tracking deposition.

Immediately after receiving these screen captures, FedEx investigated whether FedEx's source code production encompassed all systems related to the screenshots. FedEx located additional source code related to the screenshots and immediately produced that code so that WebXchange would receive it before the tracking deposition.

FedEx understands that WebXchange would like additional time to review the additional source code and to question a FedEx witness about it.  Accordingly, FedEx will produce a witness to testify regarding the additional source code produced yesterday, including the native format of this code produced through NCC Group.

Sincerely,

*Joyce Craig*

Joyce Craig

JC/bat

# EXHIBIT C

# FINNEGAN | FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
WWW.FINNEGAN.COM

JASON W. MELVIN
202.408.4125
jason.melvin@finnegan.com

November 5, 2010

Charlotte Pontillo, Esq.                                      **Via Electronic Mail**
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, New York 10019

Re:  WebXchange, Inc. v. FedEx, CA No. 08-133-SLR

Dear Charlotte:

We write to address some of the numerous inaccuracies in your letter of November 2, 2010, regarding the 30(b)(6) deposition of FedEx on tracking on November 12, 2009.

WebXchange continues to assert that the web pages it identified on November 10, 2009, two days before the November 12 tracking deposition had always been accused of infringement by WebXchange despite the fact that the web pages in question and the source code FedEx produced for the web pages do not involve the use of "web services" or SOAP-XML messages.

WebXchange had ample time before and since filing suit, including hours and hours of reviewing FedEx software, to have identified the web pages at issue to FedEx sufficiently in advance of the deposition to ensure that any additional source code files of interest were also made available for review before the deposition. Quite simply, WebXchange could have avoided all of this complaining by simply following the proper process, as opposed to trying to ambush FedEx on the eve of a deposition.

Also contrary to your assertions, and despite the late identification by WebXchange, FedEx's witness Joel Neely was well prepared to answer questions about FedEx's accused tracking systems and did so. As Mr. Neely explained, he has been involved in software to support FedEx's tracking operations since 1993, including ongoing experience both writing and designing software. See Depo. transcript at 29-30. He answered the specific questions regarding various tracking systems.

For example, pages 52-114 of the transcript contain questions and answers regarding source code for FedEx's mobile website, pages 149-177 contain questions and answers regarding source code for the primary website that WebXchange identified the week of the deposition, and pages 182-242 contain questions and answers regarding an "architecture diagram" that WebXchange fabricated for the deposition. In the last range of pages, the witness explained how the diagram was

901 NEW YORK AVENUE, NW  |  WASHINGTON, DC 20001-4413
PHONE: 202.408.4000  |  FAX: 202.408.4400

Charlotte Pontillo, Esq.
November 5, 2010
Page 2

inaccurate and failed to distinguish the multiple ways that customers can access FedEx's systems that had been discussed throughout the deposition.

WebXchange's assertion that an agreement between the parties was "in light of FedEx's designee's remarkable unpreparedness" is pure fabrication. WebXchange's counsel never raised this during the deposition or even at the conclusion of the deposition. Indeed, at no time until the October 2010, meet and confer calls and your letter of November 2, 2010, did WebXchange assert that FedEx's witness was unprepared at the November 12, 2009 deposition.

Despite substantial questions and answers regarding FedEx tracking during the November 12, 2009 deposition, FedEx agreed that WebXchange could have additional deposition time regarding FedEx tracking, specifically, the 255 code files and the interaction of that code with the rest of the tracking operation. FedEx never agreed to submit to two additional depositions on tracking, a second by written questions and a third by oral questions. FedEx agreed to consider WebXchange's written questions, which we subsequently informed WebXchange in our letter of January 20, 2010, vastly exceeded the scope of the parties' agreement (i.e., they were not limited to the 255 code files and the interaction of that code with the rest of the tracking operation) and were therefore improper. In our letter of January 20, 2010, we gave WebXchange the opportunity to narrow the questions commensurate with the scope of the parties' true agreement: questions regarding the November 11, 2009, code production or how programs in that production directly interact with other systems. WebXchange declined to respond to or raise any issues for almost ten months.

Your letter of November 2, 2010, further asserts for the first time, that the written questions are directed to "the areas that were inadequately answered in the original 'tracking' deposition." Not only is the first time you have made that unsupportable assertion but it is clearly outside any agreement by the parties. As we explained in our letter of January 20, 2010, the Federal Rules require agreement of the parties or leave of the court before proceeding with such duplicative questioning.

FedEx remains willing to provide a witness to discuss aspects of the source code produced on November 11, 2009, and how it interacts with other FedEx systems. If you believe that certain questions asked at the November 12, 2009, deposition require additional answers, please identify those questions by page and line number in the transcript so we can consider your request. But we see no reason to subject a FedEx witness to two additional depositions as WebXchange proposes or to a complete "do-over" deposition under these circumstances..

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP

Charlotte Pontillo, Esq.
November 5, 2010
Page 3

Sincerely,

Jason Melvin